UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF ILLINOIS
                  EASTERN DIVISION

| | |
|---|---|
| JOSEPH HALL, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>NANCY BERRYHILL, Acting )<br>Commissioner of Social Security, )<br>)<br>Defendant. ) | No. 16 C 7906<br><br>Magistrate Judge Mason |

## MEMORANDUM OPINION AND ORDER

Michael T. Mason, United States Magistrate Judge:

Claimant Joseph Hall ("Claimant") seeks judicial review of a final decision of Defendant, the Commissioner of the Social Security Administration ("SSA"), denying his claim for Social Security Disability Insurance Benefits ("DIB"). The Commissioner has filed a cross-motion for summary judgment, asking that this Court uphold the decision of the Administrative Law Judge ("ALJ"). For the reasons set forth below, Claimant's request for summary judgment is granted [15] and the Commissioner's request for summary judgment [19] is denied.

### I.     Background

####    A.     Procedural History

On February 4, 2013, Claimant (then 65 years old) filed a Title II DIB application, alleging a disability onset date of June 26, 2012, due to a subarachnoid hemorrhage, stroke, headaches, fatigue, and dizziness. (R. 100.) Claimant's date last insured was March 31, 2013. (*Id.*) His application for benefits was denied initially on May 7, 2013 and again upon reconsideration on September 11, 2013. (R. 99-121.) An

1

administrative hearing was held before an ALJ on November 14, 2014. (R. 32-98.) Claimant appeared along with his attorney. A vocational expert and medical expert were also present and offered testimony.

On January 6, 2015, the ALJ issued a written decision denying Claimant's application for benefits. (R. 18-27.) Claimant then requested review by the Appeals Council. (R. 14.) On June 2, 2016, the Appeals Council denied his request for review, at which time the ALJ's decision became the final decision of the Commissioner. (R. 1-6); *Zurawski v. Halter*, 245 F.3d 881, 883 (7th Cir. 2001). This action followed.

### B. Medical History

#### 1. Treating Physicians

On June 26, 2012, after complaining of a headache the day before, Claimant was found unconscious by his wife. (R. 359.) He was taken to the ER and eventually transported to the University of Illinois Hospital where it was determined that he suffered a subarachnoid hemorrhage of the brain of unknown origin, and hydrocephalus. (R. 424, 430.) Claimant was treated with Keppra for seizure prevention, and an external ventricular drain was placed for treatment of hydrocephalus. (R. 430.) While at the hospital, Claimant complained of increased headaches and confusion. (R. 397-98.) Claimant was discharged after about two weeks in the hospital and advised to follow-up with his primary care provider, Dr. Gerald Frank. (*Id.*) It was also recommended that Claimant undergo outpatient cognitive rehabilitation to address his mild to moderate cognitive impairments. (R. 451.)

Shortly after his discharge, Claimant began speech therapy to address cognitive issues, such as short term memory, attention, executive functioning, and visuospatial

2

skills. (R. 322.) At some sessions he reported problems with memory and headaches, while at other times he was "doing well" or had "no complaints." (R. 330, 337, 339, 341, 357.) He was discharged from speech therapy in October 2012 after demonstrating significant improvement. (R. 322.) At that time, he was able to drive, but his return to work date had been extended due to the need for additional physical therapy to improve endurance. (*Id.*)

Claimant also followed up with his primary care physician Dr. Frank about once a month from July 2012 through December 2012. (R. 310-18.) At each visit, Claimant complained of headaches, and at times he complained of fatigue and dizziness. (*Id.*) As of December 2012, Dr. Frank completed paperwork indicating that Claimant could not yet return to work due to his headaches, dizziness, and fatigue. (R. 321.)

During the same time frame, Claimant was being treated by neurosurgeon Dr. Jonathon Citow. On September 28, 2012, Claimant complained of fatigue, mild headaches, and slow ambulation. (R. 299.) A physical exam was normal. (*Id.*) In contrast to Dr. Frank's opinion around this time, Dr. Citow indicated that Claimant could return to full duty work. (*Id.*) Dr. Citow did recommend physical therapy for gait training and prescribed Celebrex in place of Vicodin. (*Id.*) At that time, Claimant was also taking medication for high blood pressure and cholesterol, as well as anti-seizure medication. (*Id.*)

Claimant returned to see Dr. Citow in November 2012 and reported improvement with physical therapy, but stated that further therapy was recommended. (R. 301.) He had discontinued Celebrex due to dizziness, which had since improved. (*Id.*) A physical exam showed a full range of motion and was otherwise normal. (*Id.*) In

addition to headaches, Dr. Citow assessed lumbar spondylosis. (*Id.*) He also recommended further physical therapy. (*Id.*) Claimant had been discharged from physical therapy by January 2013 and reported no significant back pain. (R. 303.) His dizziness continued to improve. (*Id.*) A physical exam was normal and Dr. Citow advised that Claimant could continue full activities. (*Id.*)

Claimant continued to see Dr. Frank throughout 2013 and 2014. (R. 311, 519-21, 529-40.) He consistently complained of headaches, fatigue, lightheadedness, and difficulties sleeping. (*Id.*) In July 2013, Dr. Frank referred Claimant to neurologist, Dr. Reuben Weisz. (R. 522.) Claimant told Dr. Weisz he had suffered intermittent, but daily headaches since his brain hemorrhage, which made him feel like his "head will explode." (R. 523.) Tramadol and Ibuprofen had helped to ease his headaches. (R. 524.) Claimant said that his memory and ability to concentrate had suffered. (R. 523-24.) Upon physical examination Claimant exhibited a shuffling gait, and normal, but slow motor abilities. (R. 524.) A mental exam was within normal limits, except for "slowing." (*Id.*) Dr. Weisz assessed chronic daily headaches, possible amyloid angiopathy, and possible cervical spondylosis with cervicogenic headaches. (R. 525.) The MRIs ordered by Dr. Weisz showed small vessel disease and mild to moderate degenerative disc disease of the cervical spine. (R. 511-12.) An EEG was normal. (R. 513.)

At a follow-up in August 2013, Claimant reported that Tramadol and Ibuprofen continued to help with his headache pain. (R. 526.) The results of a physical and mental status examination remained unchanged from the previous visit. (*Id.*) Dr. Weisz

4

assessed "mixed-type headaches, chronic daily, but predominantly muscle tension with cervicogenic component." (*Id.*) Claimant was to continue with medication. (*Id.*)

Claimant was doing better until October 2013, when his headaches worsened. (R. 559.) Dr. Weisz prescribed Fioricet, which had to be increased a few months later when his daily headaches continued. (R. 559-60.) At that time, Dr. Weisz noted limited range of motion of the cervical spine. (R. 560.) As of March 2014, Claimant still suffered daily headaches. (R. 561.) His medication dosage was increased again and in June 2014, he reported that his headaches had greatly subsided. (R. 561-62.) He was also diagnosed with obstructive sleep apnea around this time. (R. 570.) In October 2014, Claimant told Dr. Weisz that his medication continued to help with his headaches. (R. 564.)

One standalone mental health record from October 2013 reveals that Claimant was seen for a follow-up with Dr. Ermias Tilahun for cognitive deficits, anxiety, and fear. (R. 506-07.) Dr. Tilahun described Claimant as anxious and agitated, with slow and stammering speech. (R. 507.) He also indicated that Claimant lacked judgment regarding everyday activities. (*Id.*) He was referred for speech therapy and a neuropsychiatry evaluation, but follow-up records, if any, are not in the record before the Court.

### 2. Consulting Physicians

Reviewing physicians at the initial and reconsideration levels concluded that Claimant must avoid concentrated exposure to hazards due to a possible history of seizures. (R. 107, 118.)

In March 2013, Claimant underwent a mental exam with consulting physician Dr. Gregory Rudolph. (R. 492-95.) He reported no past psychiatric treatment other than counseling during his previous divorce. (R. 492.) He presented some vegetative symptoms, such as difficulty sleeping and low self-esteem, and at times he was difficult to understand. (R. 493-94.) Upon examination, Claimant's affect was appropriate and his mood unremarkable. (R. 494.) He was able to take care of his basic needs, including grooming, cooking, driving and basic chores, and use judgment and reasoning skills. (R. 492, 494.)

### C. Claimant's Testimony

Claimant appeared for a hearing on November 14, 2014 before Administrative Law Judge Lee Lewin and testified as follows. Claimant completed high school and "some college." (R. 37.) He resides with his wife and her adult children. (R. 39.)

Claimant explained that he suffers from daily headaches, somewhat improved with medication, and dizziness and lightheadedness upon bending over. (R. 40-41, 45-46, 49-50.) According to Claimant, he can walk about fifteen to thirty minutes before getting fatigued and can lift a maximum of fifteen pounds. (R. 53-54, 60, 62-63.) He tried using a cane for balance issues but it did not help. (R. 61-62.) Claimant also has difficulty concentrating and following instructions. (R. 51, 58-59.) He explained that he had seen a psychologist one time, but had been unable to schedule additional appointments due to financial problems. (R. 54-55.)

On a typical day, Claimant watches his nephew for a few hours after school. (R. 44.) Otherwise, he is usually sitting or lying down to avoid getting headaches, which can be triggered by loud noises or standing for excessive periods of time. (R. 44-45.)

Claimant can shower, dress, and cook things on his own in the microwave. (R. 39.) He does not do laundry because it is too difficult to carry the clothes up and down the stairs. (R. 39-40.) He drives about once a day, but not usually longer than thirty minutes at a time. (R. 37-38.) According to Claimant, he could not perform his previous job because he could not walk enough or concentrate properly due to his headaches. (R. 51, 53.)

      D.     **Medical Expert Testimony**

Medical Expert ("ME") Dr. Ronald Semerdjian also testified at Claimant's hearing. The ME first summarized the medical records detailed above, recognizing that headaches seem to be Claimant's primary complaint. (R. 64-70.)

Next, the ALJ asked the ME what Listings he considered in reviewing the file. (R. 71.) The ME testified that he would examine Claimant's headaches under Listing 11.03, for epilepsy. (*Id.*) According to the ME, Claimant may have met the frequency requirement of that Listing (more than once weekly) immediately following his hemorrhage. (R. 72.) The ME did not clearly testify as to whether Claimant met the frequency requirement for a full year. (R. 72-73.) Additionally, the ME did not agree that Claimant must avoid concentrated exposure to hazards due to risk of seizures because he did not find anything in the record indicating that Claimant ever even suffered a seizure. (R. 74-75.) Nor did the ME believe there would be any functional limitations, such as lifting or carrying restrictions, related to Claimant's degenerative disc disease. (R. 76-78.)

Upon questioning by Claimant's counsel, the ME reported that no testing was done for memory loss. (R. 78-79.) Lastly, the ME agreed that treatment notes from

7

August and December 2013 indicate that Claimant was responding well to medication, and confirmed that Dr. Citow did not place any limitations on Claimant during that treatment period. (R. 80.)

### E. Vocational Expert Testimony

Vocational expert ("VE") James E. Radke also testified at Claimant's hearing. The VE first classified Claimant's past work as a medium, semi-skilled leader of janitorial services. (R. 82-84, 86-87.) Next, the ALJ asked the Claimant to consider a hypothetical of Claimant's age, education and work history with no exertional limitations, but who must avoid concentrated exposure to hazards, including dangerous moving machinery, unprotected heights. (R. 84.) According to the VE, the individual could perform Claimant's past work as performed and generally. (R. 84-85.) If the individual were further limited to simple, routine instructions and tasks with no fast-paced rate or quota requirements, he could not perform Claimant's past work. (R. 85, 88.) The individual could, however, perform the medium, semi-skilled positions of janitor or cleaner. (R. 89.) The VE agreed that if the same individual was further limited to light work he would be found disabled under the Administration's grids due to his age and a lack of transferable job skills. (R. 89-91.) Lastly, the VE testified that there would be no competitive work available to an individual who was off task more than fifteen percent of the work day or missed two or more days of work per month. (R. 94.)

## II. Legal Analysis

### A. Standard of Review

This Court will affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart,* 290 F.3d 936, 940

(7th Cir. 2002). Substantial evidence is more than a scintilla of evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). We must consider the entire administrative record, but will not "re-weigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (citing *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)). This Court will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." *Lopez*, 336 F.3d at 539 (quoting *Steele*, 290 F.3d at 940).

In addition, while the ALJ "is not required to address every piece of evidence," he "must build an accurate and logical bridge from the evidence to [his] conclusion." *Clifford*, 227 F.3d at 872. The ALJ must "sufficiently articulate [his] assessment of the evidence to assure us that the ALJ considered the important evidence ... [and to enable] us to trace the path of the ALJ's reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) (quoting *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)).

### B.     Analysis under the Social Security Act

To qualify for disability insurance benefits, a claimant must be "disabled" under the Social Security Act (the "Act"). A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to last for a

9

continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether he can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). The claimant has the burden of establishing a disability at steps one through four. *Zurawski*, 245 F.3d at 885-86. If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Id.* at 886.

The ALJ applied this five-step analysis. At step one, the ALJ found that Claimant had not engaged in substantial gainful activity since June 26, 2012 through his date last insured of March 31, 2013. (R. 20.) Next, at step two, the ALJ found that Claimant had the following severe impairments: cerebrovascular accident, headaches, and dizziness. (R. 20-21.) He concluded that Claimant's obesity, sleep apnea, back problems, and alleged seizures did not amount to severe impairments. (*Id.*) At step three, after specifically addressing Listings 11.03 ("Epilepsy – nonconvulsive epilepsy") and 11.04 ("Vascular insult to the brain"), the ALJ found that Claimant did not have an impairment or combination of impairments that meet or equal any of the SSA's listed impairments. (R. 21-22.)

The ALJ went on to assess Claimant's residual functional capacity ("RFC"), ultimately concluding that Claimant could perform a full range of work at all exertional

levels, but must avoid concentrated exposure to hazards, including dangerous moving machinery and unprotected heights. (R. 22-26.) Based on this RFC, the ALJ determined at step four that Claimant could perform his past relevant work as a leader in janitorial services. (R. 26-27.) As a result, Claimant had not been under a disability from June 26, 2012 through March 21, 2013, the date last insured. (R. 26.)

Claimant now argues that the ALJ erred at the step three Listing analysis and failed to properly consider his impairments and credibility when assessing his RFC. We address these issues in turn below.

### C. The ALJ's Opinion is Not Supported by Substantial Evidence.

As stated above, on review, the Court must determine whether the ALJ's opinion is supported by substantial evidence and free from legal error. *Steele*, 290 F.3d at 940. In doing so, the Court must "conduct a critical review of the evidence" and will not let the ALJ's opinion stand "if it lacks evidentiary support or an adequate discussion of the issues." *Lopez*, 336 F.3d at 539 (quoting *Steele*, 290 F.3d at 940). After conducting such a review here, the Court finds that the ALJ's opinion lacks substantial support and adequate discussion.

Like the Claimant, we begin with the ALJ's step three analysis as to whether Claimant meets or equals a Listing. As both parties recognize, the Claimant has the burden at step three, and must show that his impairments satisfy all of the various criteria specified in the Listing at issue. *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006).

Here, there is little dispute that Claimant's main complaint following his brain hemorrhage and hospitalization was headaches. While the SSA's Listings do not

11

contain a specific entry for migraines or headaches, the SSA "routinely considers these impairments under the criteria for Listing 11.03."[1] *Harris v. Comm'r of Soc. Sec.*, No. 15 CV 511, 2017 WL 1191228, at *3 (N.D. Ind. Mar. 30, 2017) (quotation omitted); *see also*, *Kwitschau v. Colvin*, No. 11 CV 6900, 2013 WL 6049072, at *3 (N.D. Ill. Nov. 14, 2013). A claimant may demonstrate equivalence to Listing 11.03 by showing that his headaches (as opposed to seizures) cause functional impairments equivalent to those described in that Listing. *Kaiser v. Colvin*, No. 14 CV 01480, 2015 WL 4138263, at *5 (S.D. Ind. July 7, 2015). Specifically, that Listing requires a showing that a claimant suffers a headache "occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment" with "alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day." 20 C.F.R. Part 404, Subpart P, App. 1, 11.03.

At the outset, we note that this is a not a case where the ALJ failed to address a specific relevant Listing. *See e.g.*, *Ribaudo*, 458 F.3d at 583-84. However, while the ALJ explicitly addressed Listing 11.03, her curt analysis on the issue fell short. She first generally cited the ME's opinion that Claimant's impairments did not meet or equal a Listing. With respect to Listing 11.03, the ALJ went on to conclude that although Claimant reported frequent headaches, there was not sufficient evidence to show that the headaches "reach the level of severity found in Listing 11.03." (R. 22.)

First, the ME's testimony as to the Listings, specifically the headache frequency requirement, was not as clear cut as the ALJ implies. In fact, the ME contemplated that the evidence in the record indicates that Claimant would have satisfied the frequency

---

[1] As the Commissioner points out, the criteria for evaluating neurological disorders was revised following the ALJ's decision and the Appeal's Council's denial of Claimant's request for review. Listing 11.03 is now reserved. 81 Fed. Reg 43048, 43056 (July 1, 2016).

12

requirement of Listing 11.03 "for a period of time" following his hemorrhage because he was having daily headaches. (R. 72.) When asked if Claimant would have met the requirement for a year-long period, the ME explained that Claimant experienced headaches daily in July 2012, but eventually had only "occasional" headaches two years later in June 2014. (R. 73.) Given that this is a two-year time frame, the possibility certainly remained that Claimant may have met the frequency requirement for a year, yet the ALJ did not probe the ME further for specifics.

Also concerning is the ALJ's decision at step three (and in her RFC assessment) to somewhat gloss over and minimize Claimant's complaints to treating physicians of frequent and limiting headaches for the entire two year period following his brain hemorrhage. Strangely, the ALJ did not appear to acknowledge the records showing Claimant's unwavering complaints of headaches to his primary care physician Dr. Frank. (*See* Pl.'s Brief at 8-9 for a summary of those records.) Instead, in support of her decision, the ALJ chose to zero in on positive treatments notes from his neurologists about relief from medication and various periods of improvement. Although an ALJ need not reference every piece of evidence in the record, *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008), she may not cherry-pick certain evidence, while otherwise ignoring an entire line of evidence relating to Claimant's complaints of chronic headaches and alleged limitations. *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). The ALJ's decision to cherry-pick only the positive evidence to support her conclusion here requires remand for further assessment at step three. Of course, this is not to say that Claimant will meet or equal both requirements of Listing 11.03 but, at

13

a minimum, a more thorough review of the record is required, and it is up to the ALJ to expressly address any conflicts in the record before her.

Given this decision to remand, we comment only briefly on some of the Claimant's remaining arguments. First, the Court agrees that the ALJ's credibility assessment also falls short. Not only does the ALJ include the oft-frowned upon boilerplate credibility language, *see Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010), but her reasons for rejecting Claimant's complaints (which notably appear consistent with his contemporaneous complaints to doctors), are not made clear in the opinion.[2] On remand, the ALJ should properly re-examine Claimant's credibility as required under the relevant Social Security Rulings. (*See* SSR 16-3p, which recently superseded SSR 96-7p.) Further, for similar reasons as above, when re-assessing Claimant's RFC, the ALJ should take care to consider all of the relevant medical and other evidence in the record, including evidence of impairments that are not severe, and any purported limitations. *See* 20 C.F.R. § 404.1545(a)(1); *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008).

## III.    Conclusion

For the foregoing reasons, Claimant's request for summary judgment is granted and the Commissioner's request for summary judgment is denied. This case is remanded to the Social Security Administration for further proceedings consistent with this Opinion. It is so ordered.

---

[2] At one point the ALJ questioned the Claimant's credibility as it relates to his decision not to return to work. Specifically, the ALJ opined that Claimant may not have returned due to a conflict with the company philosophy as opposed to any disability. While the Claimant did testify that he had some problems with the company philosophy, a full review of his testimony makes clear that he did not return to work because he did not believe he could perform the functions of his job.

_____
**Michael T. Mason
United States Magistrate Judge**

**Dated: February 6, 2018**